Thank you, your honors, and I will endeavor to reserve five minutes for rebuttal. May it please the court, my name is David Fox on behalf of March For Our Lives Idaho. Two years ago, amidst a surge of youth political activism in Idaho, the Idaho legislature amended its voter identification and registration laws to reduce for the first time the types of identification that can be used in Idaho elections by specifically eliminating student identification as a valid means of identification for voting and for registration. The record supports the conclusion that this was a targeted strike on young voters' political participation by a legislature that was expressly concerned with the age of voters that voted using particular means and careful to avoid doing anything that would make it harder for elderly voters to vote. The case should have proceeded to trial on that basis. There are three issues. First, whether the district court correctly ruled that March For Our Lives Idaho has standing. Second, what test governs our 26th amendment claim. And third, whether there is a dispute of fact under that test that precludes the summary judgment that was granted for the defendant. And I'll plan to take those in that order. First, standing. The district court correctly ruled that March For Our Lives Idaho is injured as an organization by the challenged laws. The analysis is quite simple. March For Our Lives Idaho helps young voters, particularly students, register and vote. And the challenged laws make that harder. Before the challenged laws, March For Our Lives Idaho knew that everyone it was approaching who was a student had what they needed to register and vote. After the challenged laws, they don't. And that requires them to divert resources and it makes their existing activities of helping students register and vote more burdensome. And so March For Our Lives has to spend additional resources overcoming those injuries. The district court considered all of that and rightly held that March For Our Lives Idaho has organizational standing. It did so even after the Supreme Court's recent decision in Hippocratic Medicine, explaining that unlike the Hippocratic Medicine plaintiffs, which were bystanders with a moral objection to the regulatory action that they March For Our Lives Idaho is directly affected in its existing activities by the laws that they challenged because they helped students register and vote using student I.D. and now they can't. Idaho's contrary arguments on this score fail. First, they rely on this court's decision in American Diabetes Association to argue that this is just business as usual for March For Our Lives because it was always helping students register to vote. But the critical distinction is that here the challenge laws made March For Our Lives Idaho's business of helping people register to vote harder. And that wasn't true in American Diabetes Association. The law that was challenged there actually made what American Diabetes Association had been doing a bit easier. And the only activity that they alleged was caused was a need to explain it once to someone who they would have explained the old policy to anyways. That is completely unlike this case, where the laws are a targeted attack on exactly the population that March For Our Lives Idaho helped register and vote and made that activity harder. Idaho also argues that the injury asserted was too speculative because it was in large part forward-looking testimony about what March For Our Lives would do in response to the challenge law rather than what they had already done. That is just an artifact of this case's timing. The laws were passed in early 2023. Discovery closed in October 2023. There was no general election in Idaho during that period of elections. There was no state or federal election that year. And so, of course, yes, March For Our Lives was explaining how the law would affect what it would do in the future because that was the time period in which the evidence was being offered, the discovery was being taken. It doesn't suggest that that in fact hasn't happened. And it's well established that imminent injury is sufficient. You don't need to show past injury. As for what happened once the laws took effect, I'd urge the court to take a look at the Babe Vote amicus brief, which discusses the impact of these laws in the 2024 election, but that's not in the record because of when Discovery closed in this case. I'm happy to address associational standing as well, but unless the court has questions, I will move on to the 26th Amendment standard. Our position on the 26th Amendment standard is simple. Just like the 15th Amendment prohibits race discrimination in matters having to do with voting, that's from Bolden, so too the 26th Amendment prohibits age discrimination in matters having to do with voting. That means both facial discrimination and facially neutral laws that are, quote, motivated by a discriminatory purpose. That's also from Bolden. To decide whether a facially neutral law is motivated by a discriminatory purpose, the court should apply the same test that courts always use to answer that question, Arlington Heights. The reasons for applying the 15th Amendment standard to the 26th Amendment standard are simple. The text is identical. Both amendments provide that the rights of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of age or on account of race, color, or previous condition of servitude. The text is the same, so the test should be the same, because when a term is obviously transplanted from another legal source, it brings the old soil with it. That much at least appears to be undisputed by the parties on the appeal. The district court had some doubt, but I don't read Idaho to seriously dispute that the 15th Amendment standard should guide the 26th Amendment analysis. And the Seventh Circuit's Tully II decision on which both the district court and Idaho rely so heavily also agreed that the 15th Amendment analysis was the right starting point for 26th Amendment analysis. But then Idaho and the district court go astray in what that 15th Amendment analysis requires. And in particular, they blend together two distinct issues and thereby muddy some waters that should be clear. So the first issue is the question about facial discrimination. That is a law that expressly treats people of different ages or different races differently. And intentional discrimination via a facially neutral law. That is a law that is motivated to harm people based on a protected characteristic, but that treats everyone facially equally. It doesn't apply different procedures to different people. Can we assume motivation from effect? That is to say there clearly is a differential effect on young people. Can we the motivation from the effect or do we need evidence of motivation beyond that? Under the Arlington Heights analysis, the court certainly discriminatory effect is one important prong for discerning motivation. I think under the Supreme Court's recent approach in some of these cases, I would be reluctant to say that discriminatory impact alone without more is enough. So what evidence do we have beyond effect? So the key piece of evidence relates to the same simultaneous treatment on the one hand of student identification and on the other hand of the affidavit option in lieu of offering identification to vote for voters who are already registered. And with student identification, there were concerns raised about the impact on young people. They were entirely disregarded by the legislature. On the affidavit option, legislators who are considering and pushing to eliminate the affidavit option specifically asked for a breakdown of the age of the voters who use the affidavit option. They received a breakdown which showed that voters disproportionately use the affidavit option. There were then statements repeatedly made by multiple legislatures on the floor about the importance of protecting elderly voters ability to vote about the fact that elderly farmers may not have access to identification, may not need identification anymore. And they then declined to restrict the affidavit option for identification while eliminating student identification. And this is particularly significant because the affidavit option, of course, the pretext that has been advanced to the elimination of student identification is that the cards are not secure enough, although there's very little of that in the legislative record. But, of course, an affidavit option is less secure than any form of student identification because it is just the voters own say so that they are who they say they are. And so the fact that the legislature was especially specifically concerned about age and then specifically declined to eliminate one form of identification after learning that it was used by elderly voters and in doing so said they were restricting student identification that clearly is disparately used and disparately affects young voters is strong evidence of intent. Do we have evidence as to the type of voters the young people were that is to say Democratic, Republican or Independent or other and the political orientation of those in the legislature who were restricting the student identification? Is there some reason, is there some conflict there that is to say do we have, for example, legislatures of one party trying to make it more difficult for people to vote when those people are largely of the other party? Is there any such evidence on the record? There's not evidence of the partisan affiliation of the young voters who are using student ID or of the voters who use student ID more generally. And it is, you know, I think we might make assumptions, but I actually don't think those assumptions are safe, particularly in a state like Idaho. It's just not in the record. There was nothing in the record. There's nothing in front of the legislature about the partisanship of the students who vote using student ID. It is certainly true that as I recall the votes on these measures, they were substantially partisan divides. I think the Democratic legislatures in general voted against these bills and that the Republican legislators in general voted for them. I don't have those votes in front of me, but there's not evidence of the second half of that. There's not a suggestion that the legislators were focused in this case on the partisanship of the users of student ID. And I think that's important because it distinguishes this case from a case like Alexander where you have this inextricably intertwined partisan and racial consideration. Here there's no evidence of partisan considerations and they're not, I mean, Idaho's defense is not that they were trying to make it harder for Democrats to vote. There's not a word of that in the legislative record. There's not a word of that in their brief. Okay. And what did the district court make of that, of the McGrain's policy director's request of the age-based voting patterns with respect to the young voters and then the affidavit used by the older voters? The district court seemed to view that discussion of the affidavit issue as sort of distinct and irrelevant. I don't think she seriously contended with the fact that this was happening at the same time, the same legislature, the same folks, sort of as part of the same broader debate. You know, I think her view was that's about a different issue. It's not about student ID. And so she did just, in our view, just didn't draw the inferences that we're entitled to have drawn, especially a summary judgment from the fact that the same legislature that was doing this was clearly concerned with age. You know, I think it's fair as well to infer that the legislature didn't need to ask about the age of people using student ID because it is obvious to anyone that the age of people using student ID is going to be disproportionately young voters. And there's also plenty of evidence in the record that the legislators concerned about student ID were people from college towns. They were thinking about college students. Counsel, let me ask you about the proper framework that we need to think about this. Does Heller instruct us? Are we having to figure out, based on Heller, how we're going to define terms like right to vote, deny, abridge? In other words, do we need to determine how these terms were understood at the time the 26th Amendment was ratified in 1971? So that is the Tolley approach. And I want to be clear that we win under that approach. So I don't know that you need to resolve that debate in this case because Tolley says, well, look at the right to vote at the time the 26th Amendment was adopted. In that case, they said, look, there was no mail voting. So how can a restriction on mail voting abridge the right to vote? This isn't a case about mail voting. This is a case about voter ID. When the amendment was adopted, Idaho didn't have voter ID. And so it is, in fact, harder now to vote in Idaho in the relevant respect under these laws than it was when the amendment was adopted because there was no voter ID requirement at all when the amendment was adopted. And so if you if the court does adopt that focusing on the historic right to vote, then we should win because there is an abridgment as compared with that. I would urge the court, though, not to do that. It allows a great deal of voting discrimination to go unprotected by amendments that are intended to prevent voting discrimination. In particular, I find it quite shocking that the Seventh Circuit in Tolley 1 and Idaho in their brief here says that a law that expressly allowed white voters to vote absentee but did not allow black voters to vote absentee would not violate the 15th Amendment. I think that is a conclusion that the court should be very reluctant to reach, and I don't think there's any need to reach it. I think it is far more straightforward to conclude that what it says is, however, a state allows voters to vote, it cannot discriminate in the ways that allows voters to vote based on the prohibitive characteristics, whether that's race for the 15th Amendment or age for the 26th Amendment. And I think that is a straightforward test. It's easy to apply and it's consistent with the clear language and purpose of the amendments. And in particular, I think the reason why these amendments are all phrased in terms of deny or abridge the right to vote is that they were not substantively creating a right to vote. States have all sorts of requirements for when you can vote. Some states disenfranchise people based on different types of felonies and so on. And so the 15th Amendment and the 26th Amendment don't say, you know, these groups affirmatively have the right to vote. They just say age or race can't enter into it. And I think that's why. And that is a framework that was adopted in these amendments that was clearly intended to reflect changes as states changed who was eligible to vote. The amendments would continue to say that's fine as long as you don't deny or abridge the right to vote on behalf or based on these prohibited characteristics. And so you just you just can't intentionally discriminate against people based on age. I think part of the reason courts have gotten tangled up over this is that it is just counterintuitive in under federal constitutional law to think about age as a prohibited discriminatory characteristic. And I get that, of course, under the Equal Protection Clause, age is not a protected characteristic. But the 26th Amendment says what it says, and it was specifically designed to eliminate age discrimination in voting and the court should enforce it as it's written. And, you know, I think Idaho's primary argument is that there is a separate requirement that the abridgment or denial of the right to vote be material. And we just urge the court to reject that argument. I don't think the district court accepted that argument, although the reasoning isn't entirely clear. I think the district court instead relied on the facial versus intentional discrimination point. But the 15th or the 26th Amendment and the 15th Amendment do not say there may be no substantial or material denial or abridgment of the right to vote. They say there may be no denial or abridgment of the right to vote. A small diminishment is as much a diminishment as a large diminishment. And if the court were to adopt a substantiality or materiality requirement, it would need to devise some test for deciding how much of a burden is too much of a burden. There's no guidance in any of the cases that Idaho cites that would help answer that question. They try to rely on the Anderson-Burdick line of cases, cases like Crawford, but Crawford can't answer that question. They're concerned with reasonable non-discriminatory voting laws. And by definition, a 26th Amendment claim is arguing that the law is discriminatory, so it takes it outside of Crawford. And there's just no support for the idea that it needs to be material. It is true that in a lot of these cases, especially the civil rights era cases, the court was considering extremely egregious laws designed to entirely disenfranchise Black Americans. And yes, in the course of describing those laws, they explained that they imposed a substantial material, outrageous burden on the right to vote. But the court never purported to impose that as a separate test or as a separate requirement. In short, the amendment means what it says. If you discriminate on the basis of age in voting rights, then you have violated the 26th Amendment. And I will move on to Michael Zarian. Thank you, Your Honors. May it please the Court, Michael Zarian on behalf of Idaho Secretary of State Phil McGrain. States have the constitutional authority to decide the times, places, and manners of elections. Since its founding, Idaho has always used this authority to make voting as easy and secure as possible. And the companion bills that March for Our Lives has challenged is no exception. These laws streamline voting by creating a single list of acceptable forms of identification across all methods of registering and voting, while omitting IDs that cannot be reliably used to verify identity, like student IDs. My friend on the other side has tried to frame this as an attempt to place special burdens on young voters. But nothing could be further from the truth. In fact, these laws don't place a special burden on anyone. Any student who would have used a student ID before is now simply in line with the rest of the electorate, who has always had to go to the DMV and obtain a compliant identification, couldn't use student IDs before. So this case is really about seeking special treatment for students and not equal treatment, which is why these laws cannot be an abridgment of the right to vote under the 26th Amendment. The laws are also not an abridgment because the steps to require a no ID are not material burdens and because there's no evidence whatsoever of any intent to hamper young voters. I would like to start with standing. We didn't talk about associational standing today, and I think it would be incredibly difficult and impossible for March for Our Lives to show murkiness and inconsistencies in Ninth Circuit case law about, is there a need to show us, identify a member? Can a group that calls people constituents, can they rely on their injuries? I think just jumping to the end about, is it clear and not speculative that any constituent of March for Our Lives, Idaho, they would be injured? Just jumping to that, there are no facts in the record showing that anybody who they claim as constituents would be injured. The only evidence they've cited this entire time is one declaration that says that some of their constituents have driver's licenses and previously relied on their student identification card in order to register to vote or vote. But then in a deposition, that same person who filed that declaration said, was asked, are you aware of any members who have used a student ID to vote in elections? And she said, no. So we have some, there's case law that we cited in our brief explaining why affidavits contradicted by a declaration are not good enough to get past summary judgment. And that's all the evidence that they have that anybody is going to vote who they claim is a constituent. And also these people could vote with an affidavit. So even the people that are being talked about in that quote don't need to go to the DMV to get a license. The second type of standing, moving to organizational standing, really I haven't heard much about the idea that needing to get information from, or asking the DMV for information or transmitting that information via an Instagram post or by retraining volunteers. I haven't heard much about that being a harm. And that wasn't brought up again in the reply either. And sensibly so, I'd say, if it really were the case that somebody who's in the business of educating the public could have standing anytime some new development happens, then CNN, law professors, legal reporters, everybody would have standing to change every, to challenge any change in the law. The real key language in Alliance for Hippocratic Medicine is about interferences with core activities. And it's not an interference. It wasn't harder to transmit that information to the public. So then it just turns on the question of whether the effect on their registration activities is enough under Alliance for Hippocratic Medicine. And legally, we think this is a, we think that legally this can't suffice. There's been no direct injury to any legal rights of March for Our Lives. They've decided to sort of jump into the mix by helping people who are directly regulated, voluntarily have decided to help those people. But much like lawyers who help people comply with the law, lawyers don't have standing to challenge every time the law changes. For example, a new form that needs to be filed with the SEC, a lawyer can't say, well, now it's gonna be harder for me to help my client comply with the law. This is a burden on me as a lawyer. I'm going to sue to challenge the new SEC regulation. That's basically the same thing as this case. March for Our Lives says, now we have to do more steps to help people comply with the law, but they're not directly regulated, and that's the key insight of Alliance for Hippocratic Medicine. It's not a direct harm to them. But even on the facts, we think that, we know that that issue is going to be addressed by the Arizona Alliance case that's being heard on Bonk. And these same arguments that have been aired here are, were aired in the on Bonk opinion, or in the on Bonk argument, which is the opinion still not out. We think on the merits, the facts of this case is a much more straightforward way to resolve no standing. They said that they will drive people to DMV, but I'm sorry, did you have a question? I have a question. Yes. Do you think our panel should hold our decision in this case, and await Arizona Alliance decision? I don't think it's necessary, only because the sort of public education type things that they've undertaken in response to the law aren't really going to be at issue at Arizona Alliance. Registration is going to be at issue, but here, the issue can just be resolved in the facts. So I think the court can just proceed to the facts and explain, there is no evidence that they will drive anyone to the DMV. In the deposition, their representative said they're not aware of anybody who is unable to vote because they don't have an ID, anyone who is unable to get to the DMV. They've never driven anyone to the DMV before, and so the idea that they are going to be materially burdened by having to drive people to the DMV, we don't even, as we can tell, in 2022, there were only 100 people, roughly, in the data that we were able to collect, which is most of the counties in Idaho, there were only 100 people who used only a student ID to vote at all, and out of those 100 people, we don't know whether they had another form of ID, and we don't know which one of those people's March for Our Lives we'll ever find, and then we don't know once, if they do find one of those people, whether they'll ever drive those people to the DMV. The right answer, when you're asked, should we wait for the en banc, is almost always yes. Almost, Your Honor, on this one, the facts make it clear, and for the Satanic Temple case is the example, we cited that in 28J, was issued just a month ago, and it's on this exact same issue, but they didn't wait for the and so that was our case as well, and so that's why we're, we would argue for that. So counsel, let me make sure I understood, you're saying, look, there's not that many people who use their student IDs to vote anyway, right? That's correct. What was the purpose of the law then? To, Idaho has tried to make its elections as secure as possible and wanted to foreclose any loophole that could possibly be used for fraud, and this was going to have a minimal impact, so we didn't think it was going to be challenged at all, honestly. What evidence of fraud was there with respect to student IDs? We haven't been able to detect, we haven't detected yet any evidence of it actually happening, but. So fraud was imagined as a possibility, but there was no evidence of fraud using student ID? Imagine makes it sound a little more speculative than it really is. We've shown what the IDs look like, student IDs versus government IDs. Well, take away the word imagined, there was no evidence of using false IDs for that purpose. It has not happened yet, and it won't be able to happen in the future, thanks to this law, but in Crawford, it does talk about two separate interests, both in preventing fraud and also promoting public confidence in the integrity of the election. In enacting this legislation, was there anything in front of the legislature in terms of student IDs in other states? I mean, how broadly did they sweep in trying to figure out whether this was a potential problem? There's no evidence in the record about what the legislature considered, but I can tell you that multiple other states have also prohibited student IDs from being used in elections. In Idaho, there are IDs printed from the University of Idaho that said not to be used for official government identification, because it wasn't backed by any actual government ID. Generally, to get a student ID, you have to show a birth certificate or some sort of identification, but the University of Idaho didn't ask for that. So they printed not to be used for official government identification, but under the previous law, they could be used for government identification. The legislature surely was aware of all of these. And so when the university prints on there's not to be used for identification, that's in response to this statute? That was before this statute, and that's why this statute, that's one of the things the legislature was aware of and said, well, then these IDs probably shouldn't be used for government identification if they're really not backed by any other government identification, like a birth certificate. So that statement was on the identification, yet the students were able to use it for voting? As far as I'm aware, yes, Your Honor, before the law took effect. Okay, I have some questions for you. Yes. Do the challenge laws disproportionately impact young voters? The only data we have in the record shows us there was about 14 more young voters than old voters who used it. So a slight disparate impact. I think there's... Does that matter? That it's slight? I think it undermines the idea that this is a targeted attack on young voters, and that if it's a small attack, if you really wanted to get at young voters, all you're going to do is this delta of 14 voters, at least the data on one election. Not a very good targeted attack, and undermines the idea that this really would have, this will strike it to the young voters. So I think it really undermines the idea of intent. I think Your Honor asked a little bit earlier about, is disparate impact enough? And the Feeney case actually makes very clear, and this is a case from back in the 70s, that disparate impact is generally not enough to show intent. On this merits question, I wanted to return to Judge Alba's question, from before, which was the question of, how does Heller impact this? And I don't know if this is really a true, needs to be a real originalist inquiry, but the question under the text of the 26th Amendment is, has the right to vote been abridged on account of age? There's two parts here. What does it mean to abridge? And then on account of age is this intent portion. And abridge, every court is in unison that abridgment means a significant obstacle to voting. Not any tiny obstacle, because basically every law that tries to protect any order in voting, instead of having chaos, having structure and organization voting, will have some sort of a burden. And this is what Crawford talks about, says that not every law is going to increase everybody's lot equally. A significant burden. And you can go through Harman. Harman talks about there needs to be a material requirement. By consequence of not paying the $1.50 poll tax, what is the alternative? It is that right there, a denial or abridgment. And it was a certification, a residency certification in that case. So you had to file it every election. It had to be six months before the election. It had to be notarized or witnessed. It had to be brought in person. And they said this is, the Supreme Court said this is a real obstacle. So it doesn't have to be an enormous obstacle. It has to be a material or significant obstacle. You're getting that from the use of the word abridge? Right. And that's from the 24th Amendment. And the 15th Amendment, Lane v. Wilson, talks about that this, that the right to, the 15th Amendment hits, I think it says, hits onerous procedural requirements that effectively handicap the right to vote. So you're saying abridge carries with it the adjective significant abridgement? Absolutely, Your Honor. So even though the adjective is not there, you're saying we should read it into abridge? That's what an abridgement is. Abridgement isn't effect in any way, but abridge is a significantly limit. And that's how every, no court has said it doesn't carry that adjective. The Walgreen case says we understand that this, there needs to be, we're going to send this back to the district court to decide whether the limitation was of a significant nature, and therefore it constitutes an abridgement. Tully too walked through all of these cases, reached the same result. The Nashville District Court case addressing this exact same law reached the same result as well and said, well, this is not an abridgement because it's not a significant burden. But I think apart from whether the burden is significant, and Crawford says that this is not a significant burden, in Idaho, there's always been some sort of in-person aspect to registering to vote. And so this is not even above the usual burdens of voting. But apart from is this significant, a significant material burden, there's a separate question which I haven't heard my friend on the other side address at all or have any response to, which is that under the Reno versus Bossier Parish case, the question is not whether you are worse off under the 15th Amendment, which they have said should be brought with into the 26th Amendment. The question is whether your rights are lower than what the rights ought to be. And so everybody in Idaho, other than students, is at, I need to make an in-person visit to get a compliant ID, except students. And now students are right in line with everyone else. So their rights can't be abridged because they are right in line with the baseline. They might be slightly worse off because before they had an exception and they did not need to make an in-person visit to the DMV. But now they're right with everyone else and it can't be an abridgement. That's a nice argument, except that when you treat everybody the same, but the people start out in different situations, treating them the same is not necessarily equal treatment. And students are in a different situation from other people. That is to say, they're young. They come into the state. They may or may not have driver's license in the state. I mean, there are various reasons why the students are in a different position. And therefore, treating the students equally for everybody else may result in some desperate impact. That's, I'm saying that in the abstract. Then the question is, how does that play out on the facts on the ground? But merely because one group is treated in exactly the same way as the others doesn't necessarily mean that they've been treated equally in terms of the impact upon that group. Perhaps the impact might be different. But the question is, what should the right to vote ought to be? And if it's an even-handed regulation across all people, I can tell you now, as Idaho is one of the fastest growing states in the country, that there are a lot of outer staters of all ages who are coming into the area to vote. And all of these people will have to go to the DMV. And Idaho has made it hopefully as easy as possible. You could register to vote and then take that temporary registration card you vote and vote that same day. We try to make it as easy as possible to make sure everybody can get the ID. But it's the same requirement. It's a legal, even-handed requirement on all people. And then moving to the evidence of intent. So moving from the question of what it means to abridge versus on account of age. Here, the latest word from this court on what this Arlington Heights standard that they're applying. I don't know if it needs to be necessarily Arlington Heights, but similar concept of how do we get at knowing what the intent was. The Carrillo-Lopez case talks about the strong presumption of good faith. And that is after the cases that they've cited in the reply brief. And interprets the Abbott versus Paris case from the Supreme Court. Talks about a strong presumption of good faith for the legislature. So the question is whether any reasonable fact finder, remember that this is not a jury trial case. So this exact same district court who thinks there is no evidence whatsoever. Would they weigh this evidence and decide that it overcomes the burden, meets the burden to overcome this presumption of good faith. And here I would say absolutely not. This law serves a plainly a legitimate aim. We talked about this about both fraud prevention and creating uniformity in what is needed to be able to vote and to register to vote. There's a minor disparate impact as we've seen the data play out. The only other evidence that they've cited at all is that one representative believed this was a big issue. Student IDs is a big issue. But that doesn't say anything about its intent. That doesn't tell us anything that we didn't know already from the fact that the law passed. Is that somebody wanted this law to pass. And that's not evidence as to why they wanted the law to pass. Just that they liked the law and they wanted to pass. So all we have is something about a different proposal. And we have that one legislator asked for the demographics from the Secretary of State and from his staff and the Secretary of State's staff provided the demographics. It's on a different proposal. It's one legislator. And then we have two legislators who are expressly trying to help young people vote, old people vote. There's no evidence with respect to this proposal as to any evidence to impede anybody from voting. And from that, they want to say that in this context, we can infer that there was some intent to impede young people from voting. But one of the things that I would like to point out is they've talked about how the affidavit is less secure, but it's been kept. And that's not actually true. The affidavit, to be able to vote with an affidavit, you can't register with an affidavit. So everybody who uses the affidavit will have already registered with a photo ID, a compliant photo ID. So it's not necessarily that you can just sign and vote. There was still, from here on out, going forward, everybody will need to show an ID. The people from before have been grandfathered in because it would be much more difficult to take purge everyone from the role and make them re-register with an ID. And Idaho didn't want those negative effects on disenfranchising people. The new law requires everybody to show an ID to register to vote. Before, somebody may have registered without a compliant photo ID. But those people, instead of booting those people off the role or making them re-register, Idaho simply said, you guys are grandfathered in, and everyone going forward will have registered with a photo ID, and then you can use the affidavit at the poll because you've already verified who you are. And as I said before, one other point would be that the district courts already assessed this evidence and viewed that it was just the evidence of supposed bad intent to discriminate against young people. There was nothing there, and that any of the political stuff we see is just the regular sausage-making of making laws. And they've also tried to cite this broad climate of hostility towards young people. They've cited that minors under 18 weren't allowed to testify in a hearing, but there's all sorts of limitations on people under 18. That's just the wrong group. Those are minors who can't vote anyways, who weren't allowed to speak at some of the legislative committees, not all but some of them. They've talked about some political demonstrations that weren't even about the right to vote. There was one, I guess, about the right to vote, but that was after this law had already been proposed, and talked about there's a law making it so that you can't give extra credit to a student for voting or not voting, either way, or for supporting a specific proposal. But it's already illegal to, under federal law, to bribe someone to vote, so this is just right in line with what federal law already says. There's just no other evidence that this law was out there to try to stop young people from voting in a broader climate, in some different proposal, or in this proposal. There's no evidence whatsoever. So ways that this court can resolve this to review are that a material burden, there's been no material burden, there's been no abridgment, both because there's no significant burden being placed on students and because there's no special burden being placed on students. There's no evidence of intent to overcome the presumption of good faith. And, of course, at the beginning, we talked about standing. There's no standing. And so I'd just like to finish where I started, which is that states need some leeway and some space to be able to regulate elections, to make sure that they're safe and secure. And that's what Idaho has been trying to do, to make sure that there's eliminated any chance of fraud and make sure people trust how the elections are being run. And there's nothing in the text of the 26th Amendment or in the Supreme Court's jurisprudence that suggests it is good or prudent or even available to allow every group to challenge any law that has some sort of disparate impact, because every law at some level, it's going to be difficult to improve everyone's law equally. Idaho tries, but we've now been litigating two years on something that didn't affect very many people at all. And that's part of the problem in allowing any small burden to be challenged under the 26th Amendment. And with that, we would ask that the court affirm. Thank you, counsel. Thank you, Your Honors. A few points I'd like to make. First, we're not arguing for a disparate impact standard. We are arguing that if we show intentional discrimination or show enough to support an intentional discrimination finding, we're entitled to go to trial on intentional discrimination. That doesn't call into question every law ever passed with a disparate impact, because most laws won't be intentionally discriminatory, but our position is this one was. Similarly, we're not arguing for a retrogression standard. However, opposing counsel's views on that retrogression standard and their response to it amount to the argument that because this is a facially neutral law that formally applies to everyone equally, it is insulated from 26th Amendment review. And we do disagree with that. It is equally true that the grandfather clauses apply to every voter equally in southern states and apply the same test to each of them. It just had different effects, and it was intended to have different effects. And it's that intent that is so key. Most laws won't be intentionally discriminatory, so they won't be invalid under the 26th  Again, we think this one was. What evidence do we have not about intent, but about the degree of disparate impact? Yes. So they say there is a very slight disparate impact. That's what I just heard, which is why I'm asking. Which is why I'm asking. I would ask the court to look at the further further excerpts of Record 63, which is a page from one of our experts reports. The key point is that the denominators are very different. There are a lot fewer younger voters than there are older voters. And so when they say, well, there were 14 more younger voters who used it than older voters, yes, but there were many times more older voters than younger voters. And so it was a much larger percentage of younger voters than older voters. Now, it's true that in Idaho, most people 18 and older have driver's licenses. Most people use their driver's licenses to vote. But it is clear, if you look at that page 63 of the further excerpts, that the effect is stronger on younger voters and much stronger. When you say driver's license, does it have to be an Idaho driver? And that is a key. So there are going to be a fair number of students who do not yet have they may have a driver's license from some other state and are attending school in Idaho. Do we have any numbers on that? We do not have numbers on that. But it was something that the it's a clear issue, particularly because Idaho is a state where, number one, if you want to get an Idaho voter ID card, you have to surrender your out of state license and then you can't drive or you have to say that if you want to get an Idaho free voter ID card, you have to surrender your out of state license and then you can't drive, cannot drive until you get an Idaho license or you could pay and get an Idaho license. You have to pass a written driver's test to get an Idaho license. So there actually is a substantial burden. So if someone comes into Idaho as a student and says, I don't care about voting, but I do want to drive. Is there something in Idaho that requires them to get an Idaho driver's license or can they keep their Washington state driver's license? Do you know? As I understand the law, there is a sort of theoretical requirement that after that, after a certain number of days of becoming an Idaho resident and planning to stay in Idaho, you are supposed to convert your out of state driver's license. That's typical. I don't know. It is, as again, nothing in the record on this. My understanding is it's not enforced in practice. I think there are a lot of people in any state in the country who have out of state driver's licenses as a practical matter. But that's my understanding of what the law says. The Carrillo Lopez case and the Alexander case, these are not summary judgment cases. It just cannot be the case that at summary judgment, the standard is if it's possible to draw an inference for the government, that the government wins because it would effectively mean that there is no room for trial on the intentional discrimination question at all. Either plaintiffs present such a strong case that they're entitled to summary judgment because the only possible inference is that they win or defendants are entitled to summary judgment. There would be no room for trial. That cannot be the standard and there's no case in the summary judgment context that adopts that as the standard. Those cases also tend to come out of different contexts and in particular, Alexander comes out of the redistricting context which presents particular complexities for disentangling partisan and racial intent that just aren't present in a case like this one. I think the timing point is important. Some of the tension that they articulate between the deposition testimony and the declaration in this case has to do with the use of tense. There are people who had not had to vote with a student ID, would have had to vote with a student ID once this law came into effect. That doesn't mean that they knew they had voted with a student ID. They weren't eligible voters. The important thing to know about young voters is that until they turn 18, they can't vote and then pretty soon, they're not young voters anymore and that timing point is critical particularly when you talk about the grandfathering in process that was just described by opposing counsel because the fact is when Idaho grandfathers in previous registrants who don't necessarily need to have had ID, well, young voters are not going to be those grandfathered in residents. Every year, there are new young voters and all of those people have to comply with these new requirements. They can't use an affidavit because they weren't registered before. They weren't eligible to register before but when they become eligible to register, this law applies to them. It prevents them from using the one form of ID that all students in the state have and the record shows that it was intentionally discriminatory against them. Thank you very much. Counsel, I have one question. Does your client have a position on whether or not we should hold a decision in this case to see what the NBank panel in Arizona alliance does? So we don't think it's necessary and the reason we don't think it's necessary is that we should win even under the since vacated Mays panel decision and the reason for that is that as I read that since vacated decision, the essential issue that that panel had was they thought it was too speculative whether the challenged law would in fact affect the voter registration activities of the plaintiff in that case and there's just not an argument about that here. This law is a direct strike against the students that March for Our Lives Idaho helps to register. There's not an argument that that impact is speculative and so I think that even under the since vacated panel opinion, we would win and given that, I don't think there's a need to wait for Mays but I also don't have an objection to the court waiting for Mays if it thinks it would benefit from clarity on what the standing standard is. Okay, thank you. Thank you. Okay, that's done. I congratulate counsel on their excellent arguments. That case will now be submitted on the briefs and the panel will take a brief recess for about 10 minutes.
judges: FLETCHER, GOULD, ALBA